May it please the Court. The City is appealing from a $7.5 million judgment in this Section 1983 racially motivated breach of contract case. The City contends that the jury verdict on which the judgment rests cannot stand, both because there is no evidence that from four votes to rescind the separation agreement of the six-member City Council were racially motivated votes, and because there is no evidence or factually insufficient evidence of damages due to the breach that can be attributed to the City. To begin with, as this Court held in Griggs v. Chickasaw County, the issue of whether a City Council has taken action based on an illegal motive has to be determined by reviewing the votes and taking a head count to determine whether there's enough improperly motivated votes to attribute the claim to the City that the City itself has acted in an unconstitutional or, in this case, racially motivated way. We had six people who voted in favor of the resolution, and only three of them testified at trial. Two of these people were new members on the City Council. One of them, Mr. Thornton, there's no claim at all that he had any racially motivated sentiment whatsoever. There is another member of the City Council who didn't testify. Her name was Patty Martinez. There's no evidence that Patty Martinez had any racially motivated sentiment whatsoever. The evidence in the record shows that Ms. Martinez voted to appoint Mr. Jones as the City Manager, showed that she voted initially to enter the separation agreement, showed that there were some back and forth between various members of the Council about obtaining documents that some of the City Council members wanted and that she took up for Mr. Jones and said, you know, he's just doing what we want, that sort of thing. There was a point at which Mr. Jones and Mr. Snyder, who was the Mayor Pro Tem, became verbally angry at one another in a Council meeting over what Mr. Jones felt was an insult directed towards Ms. Martinez. And so there's no evidence that there was any hostility, racial or otherwise, between Ms. Martinez and Mr. Jones. Third Council member, Mr. Gordon, who came on to the Council, said that he voted for the rescission agreement because the new Council, you know, that based on her review of the City Charter and her review of a number of different contracts, that this particular contract did not have the proper authorization under the City Charter, didn't meet the Open Meetings Act requirements for disclosure of all the things that were in this particular separation agreement. He felt like there was no choice but to vote to rescind the agreement. So there are the three votes there. That's enough right there for this Court to come to the conclusion that there was no racial motivation to support this action to rescind a separation agreement. Finally there was a new member of the Council who did not testify, Robin Sutton. Robin Sutton, you can find that there were some things that were said by her in some of the City Council minutes before she came to run for City Council. Her main gripe was that she was opposed to, you know, irresponsible development, that she wanted more controlled development in the City, that she felt like the outgoing City Council was not doing their job in monitoring what was going on with the City. And so there's no racial motivation for her either. The whole case focuses on the actions and comments of two City Council members, an individual named Tanner Rose, who was on the Council and voted against entering the separation agreement, and the Mayor Pro Tem at the time that they voted to rescind the separation agreement, which was Mr. Snyder. And our brief is outlined in detail why those two individuals, particularly Rose, shouldn't just be glommed on with Snyder and assume that just because Snyder used some racially hostile language at various times that somehow or another Rose's motives were tainted by Snyder's motives. Our contention is that contrary to what the District Court held that the cat's paw theory of municipal liability does not work in a Section 1983 case. And the reason for that is the Supreme Court has said from Manel on that agency principles do not apply to impose Section 1983 liability on a City. That it's got to be the final policy maker itself that has the bad motives, that you can't find somebody lower down in the City that then influenced an action, who may be improperly motivated, and then say that everybody else, you know, just acted in accordance with that, that went along with it, and that somehow or another the City is liable. We see that. Counsel, I guess I'm just trying to make sure I'm following your argument, because initially it sounded like you were saying there was just, there was insufficient evidence to support this claim that there was any racial animus, which is a contention I'm sure you made in the motion for summary judgment. In the motion for summary judgment, in the motion for a directed verdict? Well, let me take it step by step. So you did it in the motion for summary judgment, which obviously was denied because you went to a jury trial. Yes. There was a motion for summary judgment, Your Honor, on the question of the validity of the three agreements that were in question. There wasn't a motion for summary judgment on the whole case. And what we ended up with was the court instructing the jury that I've already decided that this separation agreement is a valid agreement. He held as a matter of law on summary judgment that, yes, and we have appealed from that ruling. But there was not evidence, I mean, there wasn't, the issue for trial was whether or not the City had rescinded the separation agreement for racially motivated reasons, and whether or not the City, in breach of the separation agreement, caused Mr. Jones the reputational injury that he claims damaged him. And there was a challenge to whether or not that various things that went on subsequent to his departure from the city. So on the issue of racially motivated reasons, then Mr. Jones would have, at trial, had to present some evidence of this racial animus. Yes, it would have been his burden to do that, to show that the court held. And apparently the jury determined that he met his burden in that connection. That's what the jury found, apparently. They said yes to that answer. So that's what we're challenging, that jury finding it's not supported by sufficient evidence. All right, but then your legal argument now, because it sounds like you're shifting gears, I just want to make sure I'm getting the right argument. So your legal argument is that Katz-Parth theory doesn't apply in 1983 cases? It seemed to me that... And that's a legal argument. I mean, that's not the facts presented to the jurors. All right. It's a legal argument in this sense, is that if the theory of liability is that one council member who's racially motivated can impose liability on the City by recommending certain action, then it would, in effect, buy into the notion that everybody else's vote doesn't matter. They can have completely innocent reasons for doing what they're doing, but the motive of that one individual who's not a final policymaker by himself can influence... In this case, that's Snyder, is the one we're talking about. In this case, we're talking about... The idea was that the mayor pro tem, Snyder, was racially motivated, and that he recommended this through a city attorney that was hired, and there's no evidence in the record how she was hired. We know that a city attorney under the Charter has to be hired by a vote of council, and we know that she was hired months before this separation agreement was rescinded. It was rescinded along with a number of other agreements that this new city attorney found had been procedurally defective for a variety of reasons. And so there's no evidence that the city attorney was racially motivated. The theory was that they were, in effect, like two cat's paws, that the mayor influenced the city attorney. The city attorney then reported to the city council in December of 2020 that this contract is illegal, it's invalid, and it should be rescinded. So the district court, the city contends, erred in attributing motives of the mayor pro tem, Snyder, to the whole city council through the conduit of this city attorney that we know nothing about other than that she was involved with the city for a number of months. And your chief authority in support of your contention that the cat's paw theory doesn't apply in 1983 cases is? Well, I mean, the Beatty case we've cited, we've cited that we've cited Propotnick, you know, where they take up the whole issue of ratification by a city, that in the Propotnick case, you'll remember, Your Honor, was the situation where you had a decision that was made by a higher-up in a police department in the Civil Service Commission, which was deemed to be the final policymaker, approved the recommendation of the chief, but the Supreme Court in that case said, you know, they don't just, it's not just a matter of approving the decision, it's also approving the unconstitutional basis for that decision. And so the whole point of that phrasing of the ratification notion in Propotnick is that the final policymaker has to be motivated by the illegal concerns, not just encouraged and recommended to take certain action. So that's the point. You can't use agency to find your way into a culpable final policymaker when the final policymaker is acting in an innocent way. All right. The second point that I want to make quickly before I run out of time is the damage award. And there's a case called Hitt v. Cornell. It's a 2005 Fifth Circuit case, and it's a case that I think is very closely analogous to this one in the sense that you have the plaintiff's attorney in a closing argument standing up before the jury and saying, you know, the most I can see as being our pecuniary loss is X dollars. And then the jury comes back with a gigantic award of, that's where emotional distress, non-pecuniary loss and pecuniary loss are combined in a single jury answer. And in that case, the court said, you know, you look at what happened in the jury argument, and if the plaintiff's lawyer gets up there and he says, as the plaintiff's lawyer in this case said, look, you know, we know that the pecuniary loss is hard to determine. I mean, I think during the hearing on the motion for judgment as a matter of law, he was saying that it's sort of a Ray Zipsa theory, that, you know, if there's this stuff that's going on among, you know, on social media, then you can just assume that everything that Mr. Jones lost is caused by the city. But he said, you know, we really don't have sufficient proof, but, you know, you can either double or you can either give him two years of what he was making in Missouri City or you can give him another severance award, $412,000 or two times $250,000. I mean, that's what he said as sort of the base for this. The jury came back with, you know, $12 million on the 1981 claim, or $8 million on the 1981 claim, $4.5 million on the breach of contract claim. So we have to assume, based on the Hitt case, that everything else besides that half million that the counsel proposed was emotional damages. And what evidence do we have of emotional damages but Mr. Jones saying, you know, he was upset by what had happened. He was upset that he felt like his name was smeared. We don't have any connection between, you know, the resolution that the counsel did pass and all the noise that was going on on social media by various individuals, some of which, according to our record, were just citizens. A couple of them were city council members. What we don't know is that what we do know is that there was no evidence that any of these council members were authorized by the city council to speak on behalf of the city, that this was going on on their social media pages. And as this court has held, and as the Supreme Court has held, there's no action under color of law when elected officials are out there without the imprimatur of the governmental entity, you know, saying things on social media. I mean, this is, they're acting as private individuals. I see my time is up and I'll reserve my other five minutes for rebuttal. Good afternoon. May it please the Court. This case is about pretext, plain and simple. It's really what the jury found. It's what the jury had ample evidence to believe. The excuses for the city's incredible and unprecedented behavior in this case to claw back a separation agreement almost a year after it's been given and paid and agreed to by a counsel who was duly convened, duly notified and duly empowered to do so is extraordinary. All of the witnesses in this case testified. They had never seen it done before. And the collective experience in municipal government is huge. And I'm not just talking about Mr. Jones himself. He testified to all of these things. But there were witnesses who corroborated what he said, witnesses who had been in city government for years. There's, these are two in particular, Mr. Franklin, Byron Franklin, and Mr. Tim Jordan. Mr. Franklin was the police chief and then he was later the assistant city manager. He was there through all of this. He saw it all. He's a white, middle-aged man. And he concluded this was racism and it was attributable to the employment decision. Because this wasn't just a pro-growth versus anti-growth situation. What was going on here was much more than that. If it were about politics, then when Mr. Jones left the city's employ in December of 2019, it would have been over. But instead, it turned into a massive campaign immediately with the social media postings. And I do note, this is a different case than some of the cases that they're relying on and acting like this is so attenuated from city government. It's not. This, Mr. Snyder has two Facebooks. One is his personal one. One is his city of Hutto. He claims it's for campaign purposes. But the jury didn't have to believe him. He's the only one that testified for the city of Hutto. And importantly, as its corporate representative, its chosen representative to represent the city. That shows you the amount of influence and control he has over the city. And he and Mr. Tanner Rose were in lockstep together on a campaign that was relentless. It was vindictive. It goes way beyond politics. This is something deeper. Can you be very specific about the exact evidence on racial motivation? Yes. And there are three remarks by Mr. Snyder and Mr. Tanner Rose, who, by the way, did not testify. Mr. Rose did not. It was only Mr. Snyder. But the first one was Mr. Snyder's comment on city council grounds to Mr. Franklin that he could spot crooks because he had worked in a convenience store in Kansas City. And crooks, you know, the black guys who steal. Crooks equals black guys who steal. That's his code word. And he admitted that he called Mr. Jones a crook. He admitted under oath that he had called him that. And for him, that's a racially loaded word. And the whole council knew this. That is what is very clear from the record. If you read the testimony of Mr. Franklin and Mr. Jordan, the council knew what was going on. The suggestion that they were a different council made a different decision, that's not true. In fact, Mr. Gordon and Ms. Martinez were on council at the time when they voted to do the separation agreement in 2019 without fault so that Mr. Jones would get his severance. They were also on it throughout the year that all of this was going on. It started immediately. The first council meeting after they voted on the separation agreement, they were already putting things on the agenda to try to rescind it. It's in the minutes. We cited those. And again, what does that have to do with race? With Rose? Oh, well, Rose's...  Race. It has to do with the fact that they were not, they were going to turn this around. They were going to put this man in his place. That this was not over. He was not entitled to his severance. They went after him inciting an investigation immediately in that same meeting on December 3rd. And other than that one remark about when I was a convenience store person guy, I got to recognize that the crooks were black men. Other than that, what other racial connection is there to all of this? Snyder also made comments to Mr. Franklin that there were too many women and minorities in municipal government. There weren't a whole lot. Mr. Jones was the sole black person in the executive team or on council at the time. There was also a comment, and I think this really shows the vindictiveness of this campaign, that they took down the plaque in city hall that honored the city manager who built that city hall, that new city hall. This is a crown jewel in any city manager's career. And they voted to take it down at cost to the city. Thousands of dollars it cost. And Mayor Snyder testified that this was a council decision to take it down. And Tanner Rose in the meeting said he did not want Otis Jones's name on that wall. There were other people. Ms. Grier, let's assume Mayor Snyder and racial animus and all of that. You still need the Katz-Parr theory in order to get the rest of the council involved in your Monell claim, don't you? For one element of the theory. There are different ways to do it. We could do it with what I said. So even without applying the Katz-Parr theory, you could prevail. Is that what you're saying? I'm saying we could do it either way. Either the court could agree that the jurors found that four of council members, at least four, maybe five, and we demonstrated all the evidence that shows the tie-in went along with this. They knew it was pretext. They knew the investigations proved nothing. Yet they still voted on the basis of things that didn't matter and weren't true to rescind this agreement, something unprecedented. I'm waiting to hear your either way. What's the first way? The first way is by counting the heads, the head count, which is to say that at least four voted and the jury found that. Well, you've got to find racial animus in connection with the vote, don't you? That four of them voted with a racial animus is what the head count theory. That would be the Griggs case. But Katz-Parr is an alternative way to get there by showing that two demonstrated council members with racial animus infected the collaboration process. That's the Katz-Parr theory, that they had something in common. So you're saying I can just do a head count and I can assume there was racial animus? It's a presumption. It's an assumption. Don't you have to have some evidence of it? Yes, sir. I think what I'm... Okay. Well, tell me what the evidence is aside from application of the Katz-Parr theory. That's what I want to hear. Okay. Well, we've... Other than the fact that they voted and he's black, what's the evidence that it was motivated by race? Okay. I'm not suggesting that head count is based on mere votes in favor of a decision. I'm suggesting that head count is done on the basis of showing that at least four of the council members had the animus that drove their decision with but-for causation. And if you go back to the Bostock decision, but-for causation means it would have happened... It's a but-for cause action. So if you have a situation where they used the one of the car, where one person ran a red light, one person failed to show that they were turning, and the collision occurred, both of those causes could be but-for causation. So the but-for causation here, we've demonstrated as to four of the council members. I think it's pretty clear about the Mayor Schneider and Tanner Rose. Those comments are in the record and they're tied to the decision, this campaign to remove him and to take back what he was entitled to. The other council members, we talked about Peter Gordon and Patty Martinez. They were on council when they voted to give the severance agreement and finding no fault. They were also... Patty Martinez was going to leave the council and Schneider and Rose persuaded her to stay. They also voted in favor of starting the investigations and they knew the results of the investigations. They were party to an altercation that Mr. Schneider and Mr. Jones had that was perceived very differently by other people. They knew what was going on. They knew about the comments. They voted, presumably, to take down the plaque, just to... Again, I'm not hearing the evidence that connects this to race with respect to all these other people. Schneider clearly disliked the guy and maybe these other people did, too, but I don't get their animus tied to race, other than perhaps Rose and Schneider. How do you get... Well, because, I mean, Rose Sutton, I think, you know, she came on board. I think that the jury could easily infer that her reasons for coming on the board were because she was very closely tied to the Schneider-Tanner-Rose camp and she obviously was part of the decision that knowing they had no evidence of any misgiving, misdoing, and I want to be very clear on this, they had done these investigations. None of them had proven anything. In fact, in December of 2020, when they passed the resolution and they wrote the letter, they couldn't talk about anything that he had done wrong. They had to talk about defects in the process that weren't even true. So once we were able to prove at trial that they were not true, that they were pretext, because the only person who testified about them was Mayor Schneider and he was impeached at every turn because council had approved these agreements. Council had authorized Mr. Jones to go forth and contract and come back with a deal. Council had been aware of all these things that they claimed were so secret. So are you saying that the evidence of racial animus for the council members, other than Schneider and Rose, is their votes? No, no, it's more than that. What is it then? They're going along with the entire process that was so clearly infected by the racial animus. And they're voting in favor of something extraordinary and unprecedented to do to a black man, the first city manager, that had never been done to his white predecessor and wasn't done to the subsequent hire, where they clawed back what he had been given. And they posted all this information that really was offensive to someone who was a city manager. A city manager who's been accused of violating the city charter, who's been accused of entering into unauthorized contracts. This is the Austin News, do you know? It's a very damaging situation. And they agreed to all of this. They signed that resolution knowing that it was pretext. And the jury under Reeves was entitled to conclude... Was it fairly common that they would agree to pay somebody over $400,000 in severance? Was that common? The city manager, yes. It was common to give the city manager one year's severance. And the reason for that is because political winds change. People leave office because there's a political divide, right? But they're entitled to... There's precedent for a city manager leaving and getting hundreds of thousands in severance pay. That had happened before. There's testimony about it, sure, that it had happened. But with his predecessor and with others in city government. But the testimony is also very clear. No evidence of any agreement being rescinded and clawed back. And a demand from a lawyer to pay it back or we will take legal action. Those two documents, which were posted widely on the mayor's page as well as other places and talked about in an open city council member, that was incredibly damaging to Mr. Jones's career. And he had to try to come back from that. But going to Cat's Paw, Cat's Paw is an alternative theory as well, that if you believe that Mr. Schneit, as the district court did in the very extensive work that he did on the post-judgment motion, which included a lengthy hearing, a lengthy briefing, and a 57-page opinion, he really studied this and looked at it very carefully. And he agreed that basically with us, that basically Mayor Schneider and Tanner Rose, there was more than sufficient evidence for the jury to conclude that their decision to violate Mr. Jones's rights was racially motivated. So now we look at what influence did they... What's the chief precedent for the application of the Cat's Paw theory to a Monell claim? Well, Monell only says... Monell doesn't talk about Cat's Paw theory, nor do the other cases that they cited. Right, but aren't you asking us to apply it to a Monell claim? Well, Monell only says you can't have vicarious liability. Calling this vicarious liability misunderstands what Cat's Paw is. Cat's Paw is not because of my relationship with you, I am now liable. Like if I'm the trucking owner and my driver gets in an accident, I'm liable as the trucking company because he was my driver and he was in course and scope. That's vicarious. It doesn't depend on what I did. Direct liability would be something like I failed to train, I failed to supervise, I hired improperly. This is vicarious. That's not what Cat's Paw is. Cat's Paw presumes that the person made a decision but that it was infected. So you've got to have a showing of action and influence. It's an active theory of liability, not passive. And the best case we have on that is Lott. Because it is a, we cited it in our papers, it is a district court decision. I don't think it was appealed. But it is a situation where Cat's Paw was used in the context of a collaborative body. In that case it was a school board. And I think it is uniquely suited to be applied in the situation of a collaborative body. Instead of having someone who's whispering in the back room that's even harder to prove, you've got the toxic people in the collaboration room, in the deliberations. They're infecting the process. If we have jurors who are disqualified for any reason, we have to throw the whole thing out. And that's, this is the converse of that. I realize that's not an apt analogy but it's somewhat analogous. The idea is that these two people were in the room when all of these decisions were made. And these decisions went on over a period of nine months. It started, you know, I mean, basically, no, I'm sorry, 11 months. Because it started in November when they voted for separation and then it ended December 3rd, 2020 when they rescinded and sent him the letters and started the litigation. Who hires the city manager? I'm sorry? Who hires the city manager? City council. But was that a previous administration that hired Jones? Previous, different council members that hired him? Different from the ones who voted to claw back the money? It is different because it had been three and a half years. So, but I really want to speak to that because that's an argument that the other side makes to suggest that it's not the same decision maker. And they're really talking out of both sides of their mouth. Because on the one hand, they say, oh, it's got to be a collaborative body. The city council is a monolith and it's, you know, you can only act through the city council and unless everybody agrees, it's not a city council action. They used that same argument, I think ironically, to get Mayor Snyder and Tanner Rose dismissed as individual defendants. They said everything that they did was in their official capacity. It wasn't individual. They should not be in this lawsuit individually. And the judge granted it. And then as soon as they were out of the case, all of a sudden, oh, no, attenuate. They aren't the city. So I think they have to be held. If Manel liability is premised on the idea that the collaborative body is what matters, then I don't think you can say, well, it's a different decision maker because it was a different year. I mean, otherwise, you're never going to have a valid comparator. We had a uniquely qualified comparator, as Judge Lane recognized. We had the prior city manager who had also been terminated because the political winds had changed, which is what the city has claimed here. And there had been allegations of misconduct by that city manager. There was a non-disparagement agreement. There was a confidentiality agreement, just like the one here. All of that was present. And they didn't come up with pretextual reasons to claw back her compensation. And similarly, Mr. Warren Hutmacher, who followed Mr. Jones in office as the city manager, he lasted about a year. He got his full severance. And Mayor Snyder testified that no one tried to claw it back or demand him to pay it back or void his separation agreement. So, I mean, there's precedent that the only black city manager has been treated differently. And the jury was entitled to not buy all the pretextual reasons. I mean, we've outlined them in our brief to show how each one of them was struck down, including all the ones that Mayor Snyder came up with at trial, which were a bunch of new ones that had not been upheld by any of the investigations. But he kept saying, well, the Cottonwood Project, you know, that was not approved. And the $4.5 million loan, that wasn't approved. And we went through, trial counsel, you know, painstakingly showed how each of those actions had been approved by the counsel. And I can speak to the issues that they've raised, technical noncompliance issues and why they're not supported, or I can move on to damages, which I'd like to cover briefly, because the damages are a big issue. And so the damages in this case are unique for two reasons. One, because this is a very highly paid executive, and the tradition, which is testified throughout the record, is that a city manager is entitled to one year of full compensation going forward. That's what they paid a lot of people at high levels, but especially the city manager. That is a tradition to protect them in the office. And he was paid, we have the Ide Bailey report, which is in the record, and we actually took a snapshot of that to show you what the compensation was. If you take his, just his compensation, which by the time of trial, by the time of the Ide Bailey report, excuse me, was $283,000, because he had a three-year escalation each year. And so we took it out and compounded just that, just his compensation for the 16 years between the time of trial when he was 51 and the time that he would retire at 67. And if you compound with the 3% each year, it's over $6.3 million. And if you build in all the benefits that he was entitled to, it's over 9. So that's way more than the judgment's even worth. So this suggestion that all of this is all about, you know, pain and suffering damages is just wrong for a number of reasons. First of all, they're mischaracterizing what the trial counsel said. He never said, he was giving suggestions, but he was not capping the jury's discretion in any way. Second, it's more than just emotional distress damages. It's loss of reputation. It's loss of earning capacity. He testified that his career was destroyed. He's never gotten another job in municipal government. And as far as any kind of, what else, the other thing I said was unusual about this case is there's no mitigation defense that was pled or proven. So we don't have failure to mitigate and we don't have mitigation of damages. So that was just something that wasn't in the trial and that should not be a penalization to Mr. Jones because it wasn't his burden to prove it or plead it. Counsel, you're at, your time has expired. Thank you, Your Honors. All right. I'll try to move through this very quickly. First of all, with respect to the comparator that she has alluded to, this Karen Daly, the record does not show what Karen Daly's contract looked like or the amount of any severance of the, in that contract. It doesn't show whether or not that contract that was entered into by Citi at some point that the record doesn't show when it happened, that it had any of the procedural infirmities of Mr. Jones's contract as identified by Ms. Palumbo in her analysis of it to the City Council. We know that it had to have happened before 2017 and what we do see is that we have a completely different City Council in place by the time that they're voting to rescind Mr. Jones's contract. There's no proof that the council that rescinded Mr. Jones's contract even knew about Ms. Daly's situation, whatever it was. So the case law that has dealt with this comparator, using comparators to look at disparate treatment, require that there be substantial identity between the comparators. But in addition to Is there evidence in the record of any history of trying to claw back? Well, there is history, there is evidence in the record that there were 17 other City employees whose severance agreements, much smaller than Mr. Jones's, were not authorized, that cumulatively the amount was significant, but they were very small amounts except for one of the other City employees that may have exceeded Mr. Jones's spending authority. They first sent the letter to him, they also, there's evidence in the record to show that they avoided those agreements, but then they didn't send a letter to the other employees because no sooner than they got the letter to Mr. Jones, he filed suit. I just want to make sure I understand your answer. So what you're saying is that there's evidence that there were severance agreements reached with other employees, and then those agreements were voided? Yes. By the Council? Yes, that there's evidence from Mr. Snyder and others that those agreements were avoided by the City Council, but that they didn't send a letter asking them. Were they first approved by the City Council? They were not approved by the City Council. These were done at the staff level. So how was Mr. Jones's agreement? Was it approved by the City Council and then voided? Yes, it was approved by the City Council in 2000. But in these other examples you're talking about, they were never approved by the City Council. That's right. They were never approved by the City Council. That's a different category of agreement. That's right. And there's no evidence. You don't have one in the category of Mr. Jones's agreement where it was approved by the Council and then voided by the Council. That's right. There's none of those. The other agreements, we don't know who the race of those people were. A question was asked about that. No one knew. As far as Ms. Daly's concerned, we don't have any evidence that the City Council that voted to rescind Mr. Jones's contract knew about Ms. Daly's situation at all. There's no link. And so they can't act in a disparate way concerning somebody they have no knowledge of. All right. So on that argument, I think the evidence is pretty absent that they are valid comparators. The next point that I wanted to make was the not true and pretext equation that Council suggested, that we had Mr. Bingham come in at trial and testify that he disagreed with Ms. Palumbo's analysis of the procedural infirmities of that contract. There was no evidence that in the meeting that the contract was entered that Mr. Bingham walked through that kind of analysis and explained to the City Council that this all meets legal muster, that the contract was passed around, it was brought into an executive session. That city attorney recommended entering it without any discussion, without any certification by the financial officer. It just went through and was approved. It was only when Ms. Palumbo was hired that she realized that there were technical deficiencies in a number of these contracts that had been entered by the previous City Council. Finally, I should say that they're, I see my time is over, so unless the Court wants to hear the remainder of my argument, I'll cede the podium. Thank you, Counsel. Thank you. That will conclude the arguments for this morning. We are recessed until 9 o'clock in the morning.